CASE 74—CONTESTED ELECTION—MAY 19.

# Anderson v. Winfree.

APPEAL FROM CHRISTIAN CIRCUIT COURT.

1. ELECTIONS.—Under the provision of the Constitution which declares that laws shall be made to exclude from office and from suffrage those who shall thereafter be convicted of bribery, perjury, forgery "or other crimes or high misdemeanors," the Legislature has the power to pass laws excluding from suffrage not only those convicted of crimes which by the common law render the perpetrator infamous, but those who may be convicted of any other crime or high misdemeanor.

2. SAME.—One who has been convicted of grand larceny is deprived of the right to vote by virtue of the statute which provides that "any person convicted of robbery, forgery, counterfeiting, or any other

Anderson v. Winfree.

crime, shall forfeit his right of suffrage and right to hold office." The expression "or other like crime" includes all crimes not previously specified which are inconsistent with the common principles of honesty and humanity, and convict the perpetrator of degradation, depravity and moral turpitude.

3. SAME.—Where the elector casts his vote by secret ballot which is fatally defective, he ought not to be permitted to testify that he voted the particular ballot and intended it for a particular candidate; but where the vote is *viva voce*, and the clerk makes a mistake in recording it, evidence to show for whom the vote was cast should be admitted and the mistake corrected.

4. SAME.—Mere irregularity on the part of election officers, or their omission to observe some merely directory provision of the law, will not vitiate the poll.

5. SAME.—Where the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that the performance is essential to the validity of the election, they will be regarded as merely directory unless they affect the actual merits of the election.

Votes were cast within voting hours, but before the clerk and judges were sworn. The clerk and one of the judges were present. After these officers had been sworn they ratified and certified those votes. *Held*—That the merits of the election were not affected and that the votes were properly counted.

6. SAME—APPELLATE PRACTICE.—In a contested election case the circuit judge tries the facts of the case *de novo*, and upon appeal from his decision this court will give weight to his findings of fact and not to the opinion of the contesting board as to the weight of the evidence.

7. SAME.—While the law fixes what residence, its place and duration, entitles an individual to vote, whether such residence in fact exists is purely a question of fact; and the lower court having clearly and correctly stated the law relative to residence, citizenship, etc., and having separated the facts and passed upon them from the stand-point that a properly instructed jury should, this court will test the findings of the lower court by the same rule applied in reviewing jury trials.

A. H. CLARK, JAMES BREATHITT AND THE FELANDS FOR APPELLANT.

1. Where a vote appears to have been recorded and counted for both candidates, it should be altogether rejected, or, what is the same thing, counted for both parties, unless, from evidence on the book, or circumstances surrounding the election, it may be ascertained that the vote was intended for a particular candidate. And where a vote is recorded for neither candidate, but the voter's name appears on the

Anderson v. Winfree.

book as voting for other officers, the same rule should prevail, and in neither case should the voter afterwards be allowed, by parol testimony, to alter, add to, or take from the record. (Cooley's Const. Limit., chap. 17, p. 764, side page 607 (fifth edition); *Ibid.*, p. 768, side page 612.)

2. The conviction of the crime of grand larceny does not render the individual *infamous*, and thereby deprive him, under the Constitution and the statute, of the right of suffrage. (Cooley's Const. Limit., p. 487, side page 393; Const. of Ky., art 8, sec. 4; Gen. Stats., chap. 33, art. 12, sec. 15.)

3. The rule requiring election laws to be liberally construed (Cooley's Const. Limit., p. 777, side page, 618; McCrary on Elections, sec. 181), does not authorize the counting of votes cast before the polls were opened, and before the officers of the election had been sworn. (Urged in petition for rehearing.)

4. The fact that appellee and some of his friends testified that they did not know certain voters whose votes were cast for appellant, or whether they were legal voters, did not throw upon appellant the burden of showing the validity of such votes. The presumption is, that the officers of the election did their duty. (Hickman v. Boffman, Hardin, 370; Slaughter v. McCain, 1 Mar., 485; Hoy v. Mc-Murray, 1 Litt., 365; Scott v. Marshall, 5 J. J. M., 434; Gen. Stats., chap. 33, art. 3, sec. 7.)

5. The presumption in favor of the certificate of the officers of election (Pribble v. Hall, 13 Bush, 63; Dowell v. Mitchell, 82 Ky., 47) goes to the extent, at least, of requiring the party who attacks a vote as illegal to establish, by the preponderance of testimony, every fact necessary to render the vote illegal; and if, after he has proved such facts as throw suspicion or cast a doubt on the vote, if other facts may exist which are not inconsistent with the facts proved, which would clearly show that the vote is legal, it is to be regarded as legal and so counted.

6. Evidence of admissions by voters, after the election, that they were not legal voters, was incompetent. (McCrary on Elections, 270 and 271.)

7. The rule that a verdict or judgment of the chancellor on a question of fact is not to be disturbed, unless altogether without support by the evidence, is not applicable to this case. Original jurisdiction is conferred by law on the contesting board, and the chancellor, like this court, only hears the case on the record made up before the board. (Urged also in petition for rehearing.)

R. T. PETREE AND JOE McCARROLL FOR APPELLEE.

1. The judgment of the lower court upon questions of fact as to residence of voters, etc., is to be treated as the verdict of a properly instructed jury, and will not be reversed unless palpably against the evidence.

2. The contesting board and the circuit judge must consider each challenge exactly as they would do were they judges of the election in the first instance, and had the same evidence before them that is presented in the contest. In case of a contested election, a vote is only presumed legal until the contrary is shown, otherwise the provision of the law for a contest would be of no avail. (Const. of Ky., art. 8, sec. 24; General Statutes.)

3. The evidence was such as to the "unlocated" voters as to throw the burden on appellant to show *affirmatively* that they resided in the precincts in which they voted. (McCrary on Elections, sec. 356.)

4. The admissions of the voters themselves may be proved to show that they voted and how they voted. The rule which forbids such evidence as to *secret ballots* does not apply to *viva voce* votes. (McCrary on Elections, secs. 270, 529 and 530; Cooley's Const. Limit., 3d ed., side page 626.)

   The general political reputation of the voter may also be shown to determine how he voted. (McCrary on Elections, sections 196, 292 and 293.)

5. The failure of election officers to comply with the law does not affect the legality of votes. Therefore, the votes cast before the officers were sworn, and in the absence of one of the judges, were legal. (McCrary on Elections, secs. 79, 127-129; Clark v. McKenzie, &c., 7 Bush, 523; Constitution, art. 8, sec. 16.)

6. As to what constitutes such legal residence as entitles one to the right of voting. (Const. of Ky., art. 2, sec. 8; Gen. Stats., chap. 33, art. 3; McCrary on Elections, secs. 36, 36a, 37 and 71; Cessna v. Myers, *Ibid.*, p. 498; French v. Lighty, 9 Md., 478; Williams v. Whiting, 11 Mass., 424; Beardstown v. Virginia, 81 Ill., 541; 3 Pa. L. J., 310; 1 Brewst., 103.)

7. Robbery and grand larceny are "like crimes," and, therefore, under the statute, one who has been convicted of grand larceny is not entitled to vote.

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

The appellant, A. H. Anderson, and the appellee, W. P. Winfree, were opposing candidates for the office of county judge of Christian county, at the August election, 1886. The election comparing board of the county found that the appellant, Anderson, received three thousand and ninety-five votes at said election for the office of county judge, and that the appellee, Winfree, received three thousand and sixty-five votes for

the same office, making a majority of thirty votes for the appellant, Anderson, which entitled him, according to the face of the returns, to a certificate of election, which he received.

The appellee, Winfree, contested the appellant's right to the office upon the grounds that a large number of illegal votes were cast and counted for the appellant at said election—that some were not citizens of the State; some had not resided in the State a sufficient length of time to entitle them to vote; some were non-residents of the county; some were non-residents of the several voting precincts in which they voted. He also relied upon the fact that between sixty and seventy persons voted for the appellant in the two Hopkinsville voting precincts who were non-residents of said district. The appellant, Anderson, denied these several grounds of challenge, and alleged that a large illegal vote was cast for the appellee at said election, on substantially the same grounds as those urged by the appellee. The case was heard by the county contesting board, which decided that thirty-eight of the votes cast for appellant at the election were illegal, and also decided that twenty-three of the votes cast for appellee at said election were illegal. And those respective numbers being deducted from the whole number of votes cast for each candidate, elected the appellant by a majority of fifteen votes. The appellee appealed to the circuit court. The case was elaborately prepared in the circuit court by both sides. And the learned judge of that court, after hearing all of the evidence in the case, by a learned and exhaustive opinion covering all of the questions, both of law and fact, in the

·case, decided that the appellant received only three thousand and forty-four legal votes at said election, the remaining fifty-one votes cast for him being illegal. That the appellee received at said election three thousand and forty-seven legal votes, the remaining eighteen votes cast for him being illegal; and that the appellee was elected to the office of county judge by a majority ·of three votes. From that judgment the appellant, Anderson, has appealed to this court.

The appellant's counsel complains here, first, that the lower court erred in sustaining the challenge to the votes of Warner Duguid and Jack Smith, who voted for the appellant, which challenge was sustained upon the ground that they had been previously convicted and sent to the penitentiary of this State upon a charge of grand larceny.

By section 4, article 8, of the State Constitution, it is provided: "Laws shall be made to exclude from office and from suffrage those who shall thereafter be convicted of bribery, perjury, forgery or other crimes or high misdemeanors."

Pursuant to this provision of the Constitution, chapter 33, article 12, section 15 of the General Statutes, declares: "Any person convicted of robbery, forgery, counterfeiting or perjury, or other like crime, shall forfeit his right of suffrage and right to hold office."

The contention of the appellant is, that the "crime of grand larceny is not like any of the crimes named" in the statute—not even that of robbery. We can not agree to this proposition. "Larceny or theft" at common law, as defined by Blackstone, book 4, page 229 of his Commentaries, "is distinguished into two sorts:

the one called simple larceny or plain theft, unaccompanied with any other atrocious circumstances ; and mixed or compound larceny, which also includes in it the aggravation of a taking from one's house or person." " Simple larceny, then, is the felonious taking and carrying away of the personal goods of another." Mixed or compound larceny is such as has all the properties of the former—" simple larceny—but is accompanied with either one or both of the aggravations of taking from one's house or person." (Blackstone's Commentaries, book 4, page 239.) " Larceny from the person is either by privately stealing from a man's person, as by picking his pocket, or by open and violent assault." (*Ibid.*, page 240.) " Open and violent larceny from the person or robbery, is the felonious and forcible taking from the person of another of goods or money to any value by violence or putting him in fear." (*Ibid.*, page 241.)

Says Metcalf, J., in the case of the Commonwealth v. Clifford, 8 Cushing, 216 : " Robbery, by the common law, is larceny from the person, accompanied by violence or by putting in fear ; and an indictment therefor must allege that the taking was from the person, and that it was done by violence or by putting in fear in addition to the averments that are necessary in indictments for other larcenies." See also the cases there cited.

By the common law, it would hardly be correct to say that larceny is like robbery, because robbery is compound larceny, which has all of the properties of plain stealing, accompanied by the additional aggravating circumstance of taking the property from the per-

son of the owner by force, or from his presence by putting him in fear.

It is this circumstance that increases the atrocity of the crime, and distinguishes compound larceny or robbery from simple larceny—both are larcenies. But when the theft or larceny is accomplished by the aggravating circumstance of taking the property from the person of the owner by force, or putting him in fear, it is called robbery, simply to distinguish the manner of committing the theft or larceny from other larcenies.

But the statute *supra* has a broader meaning than that we have been considering.

By the common law, the crimes which render the perpetrator infamous are treason, and such felonies as are inconsistent with the common principles of honesty and humanity, and convict the perpetrator of depravity and moral turpitude; and also every species of the *crimen falsi*, such as perjury, conspiracy and barratry. (Greenleaf on Evidence, vol. 1, section 373; Barker v. The People, 20 Johnson, 460.) Such crimes, by the common law, deprive the perpetrator of the right to vote, to hold office, to testify. (See McCrary on Elections, section 20; Greenleaf on Evidence, vol. 1, section 373.)

It is the perpetration and conviction of the infamous crime, and not the degree of punishment, that renders the perpetrator infamous. By that provision of the Constitution which declares that "laws shall be made to exclude from office and from suffrage those who shall thereafter be convicted of bribery, perjury, forgery or other crimes or high misdemeanors," it was evidently intended—the framers thereof having in their

minds that class of crimes that rendered the perpetra-
tors of them, upon conviction, infamous—to give the
Legislature an express constitutional sanction for pass-
ing laws excluding those from suffrage who might
thereafter be convicted not only of infamous crimes by
the common law, but convicted of any other crime or
high misdemeanor.

The Legislature, having this constitutional provision
as a guide, and knowing what crimes are denounced by
the common law as infamous, and that the perpetrators
are, among other things, excluded from the right of
suffrage upon conviction, doubtless enacted the law
declaring that "any person convicted of robbery, for-
gery, counterfeiting or perjury, or other like crime,
shall forfeit his right of suffrage and right to hold
office," with a view to crimes declared infamous by the
common law, and meant by the words "or other like
crime," to include all crimes not previously specified,
which are inconsistent with the common principles of
honesty and humanity, and convict the perpetrator of
depravity and moral turpitude.  The several crimes
enumerated in the statute are of this class known as
infamous crimes; and it is to be presumed that the
expression, "or other like crime," was intended to
apply to and embrace such other crimes as are likewise
inconsistent with the common principles of honesty and
humanity, and convict the perpetrator of depravity and
moral turpitude.

The poll-books showed that the votes of Carter, Croft
and Glover were recorded and counted for both appel-
lant and appellee.  The proof shows conclusively that
Carter and Croft voted for the appellee, and that Glover

voted for the appellant.   The lower court deducted the
two former votes from the appellant's vote and counted
them for the appellee, and deducted the latter vote from
the appellee's vote and counted it for the appellant.

Where the elector casts his vote by secret ballot which
is fatally defective, he ought not to be permitted to
testify that he voted the particular ballot and intended
it for a particular candidate.   Because the ballot, having
been written by the elector himself, or by his direction,
or if printed, adopted by him as his own act, and no
one having the right to control his action or to become a
party to it, the act being peculiarly his own act, it fol-
lows that if such act is so defective that it cannot be
ascertained from it and the surrounding circumstances
for whom his ballot was intended to be cast, he will not
be permitted to testify for whom he intended to cast it.
In such a case no evidence should be admitted that
would be inadmissible under the general rules of evi-
dence for the purpose of supporting or explaining
other written instruments, where the parties themselves
would not be permitted to give evidence of their actual
intention, when the instrument itself wholly failed to
express their intention.   So the elector, having prepared
his ballot himself, and for himself, no party to it but
himself, no one having a right to share in it but himself,
and he prepares it so defectively that it wholly fails to
express his meaning, such as leaving the name of the
candidate blank, or writing the name of Jones when he
intended Smith, he will not be permitted to supply the
defect in the first place by testifying as to his inten-
tion, nor in the second by testifying that he intended
to write the name of Smith instead of Jones.   (Cooley's

Constitutional Limitations, sections 612, 626, 5th ed.) But, says Cooley, section 626: "If votes were taken *viva voce*, so that it could always be determined with absolute certainty how every person had voted, the objections to this species of scrutiny, after an election had been held, would not be very formidable."

The elector, under the Constitution and laws of this State, exercises his right of suffrage by a *viva voce* vote. He proclaims openly at the polls, in the presence of the clerk and judges of the election, for whom he votes; it is then the duty of the clerk, in the presence of the judge, to record his vote for that person. This duty is not devolved upon the clerk as the agent or representative of the elector; the elector has no right to record his vote; he can only announce for whom he votes; it is then the duty of the clerk to record it for that person as an officer of the election. Now, the clerk, by inadvertence or design, records the vote for another person than the one announced by the elector. So, by the record, he has voted for a candidate against whom he had in fact openly and unequivocally voted. Now, whose mistake is this? The elector? No. Because he has committed none; for when he announced for whom he voted—not intended to vote—his act was full and complete; it was all that he could do. Then it was the clerk's mistake. The clerk, by this mistake, has disfranchised the elector for the time being. Indeed worse, for he has voted him, without his knowledge and against his will, for a candidate that he did not want, and against whom he had in fact voted. That vote was not secretly deposited as by ballot, but proclaimed in the presence of at least four persons,

and usually in the presence of a large crowd. It would be a rare case, indeed, that witnesses could not be had other than the officers of the election, not only as to the fact of voting, but the candidate voted for. Not so, however, as to secret ballot voting. Then, as the mistake is not that of the elector, nor caused by any misconduct or oversight of his, nor by the misconduct of any person representing him, or acting in privity with him, but caused by an agency beyond his control, and by which he is not only disfranchised of his choice, but voted for a candidate whom he may believe is unworthy of his vote, and as the fact as to how he voted can be established with absolute certainty, and the misapplication of his vote be in nowise attributable to him, we ask by what principle of fairness should the correction be denied? Is it because the proof will contradict the record? The answer is, when it can be clearly demonstrated that the record is a mistake, it should not be adhered to when the adherence would deprive the citizen of his free suffrage—the dearest, highest and most sacred privilege he enjoys. Is it because the temptation to corruption and fraud would be so great that public policy forbids it? As in the case of the ballot, the answer is, that the elector's act is done publicly and openly, in the broad daylight, and in the presence of witnesses; and is, therefore, in a very large majority of cases, capable of the most convincing proof. If the proof is doubtful, then the record, as made by the clerk, ought to stand; otherwise, it ought to be corrected, and the vote counted as it was really cast. In this case, the record shows that the clerk, in recording these votes, made a mis-

Anderson v. Winfree.

take; and we think it is clear, according to the princi-
ples just announced, that the mistake ought to be cor-
rected by counting the votes for whom they were ac-
tually cast.

The appellant also contends that the votes of J. S.
Cox and William Cravens, who voted in the Belleview
precinct for the appellee, ought not to be counted, be-
cause, at the time these gentlemen voted, which was
early in the morning, but within voting hours as fixed
by law, one of the judges of the election was absent,
and the other judge and the clerk had not been sworn.

It is an admitted fact that Cox and Williams were
legal voters in the Belleview precinct. It also clearly
appears that the judge and clerk that received the vote
of these gentlemen, as well as the absent judge, had
been legally appointed clerk and judges of the election
for the Belleview precinct. It also appears that these
gentlemen were apprised of the fact that the clerk and
judge present had not been sworn; but wishing to go
to another preeinct, they voted with the understanding
that when the absent judge arrived, and all were sworn,
they would ratify the act. This the judges and clerk
did.

In McCrary on Elections, section 126, it is said "that
mere irregularity on the part of election officers, or
their omission to observe some merely directory pro-
visions of the law, will not vitiate the poll." As to
what is a mere irregularity that will not vitiate the
poll, the author says: "The language of the statute to
be construed must be consulted and followed. If the
statute expressly declares any particular act to be
essential to the validity of the election, or that its omis-

sion shall render the election void, all courts whose
duty it is to enforce such statute must so hold, whether
the particular act in question goes to the merits or af-
fects the result of the election or not.   Such a statute
is imperative, and all considerations touching its policy
or impolicy must be addressed to the Legislature.   But
if, as in most cases, the statute simply provides. that
certain acts or things shall be done within a particular
time, or in a particular manner, and does not declare
that their performance is essential to the validity of the
election, then they will be regarded as mandatory if
they do, and directory if they do not, affect the actual
merits of the election."

In this case Cox and Williams were certainly legal
voters in the Belleview precinct; and they voted in that
precinct for the candidate of their choice.   Their votes.
were cast at the regular election place, and within law-
ful voting hours.   And the officers of the election,. after
having been sworn, ratified and certified these votes.
The merits of the election were not affected.   We must
hold, therefore, that the lower court did right in count-
ing these votes.

The opinion of the lower court clearly defines what it
takes to constitute citizenship in this State, and also
what residence is required in the precinct to entitle a
person to vote therein.   Also, what absence, and its.
kind, will debar one's right to vote.   We also think
that the lower court, in overruling or sustaining the
objections to the vote of each contested voter, save
possibly in case of one set of voters, not prejudicial,
however, to the appellant, was sustained by competent
and positive evidence.   And we cannot say that in any

case his decision was clearly against the weight of evidence.

This view of the case renders it unnecessary to determine whether the appellants' majority, according to the face of the returns, was thirty-two instead of only thirty, as the result will be the same.

The judgment of the lower court is affirmed.

---

To a petition for rehearing, Judge BENNETT delivered the following response of the court:

The attorneys for the appellant suppose that we misconceived the evidence relative to the votes of Cox and Cravens. They say: "We think the inference is clear * * * they had no understanding with the clerk and judge present, 'that when the absent judge arrived and all were sworn, they would ratify the act.'"

The language of the only witness, the clerk of the election, is: "I told Cox and Cravens the officers of the election had not been sworn; and they said they reckoned it was all right; that the officers could fix it when they came. When the officers were sworn, the attention of S. H. Underwood, the absent judge, was called to the votes of said Cox and Cravens, and their votes were counted as the other votes. The officers of the election knew Cox and Cravens were legal voters of said precinct."

So we repeat that these gentlemen evidently voted with the understanding with the clerk and judge present, that when the absent judge arrived, and all were sworn, they would ratify the act, and they did ratify it.

The attorneys offer no objection to the propositions

of law discussed and settled by the court. But they insist that we incorporate in our opinion the definition of citizenship, residence, etc., given by the lower court, which we and the attorneys alike approve, for the benefit of the profession. While we are thankful for the suggestion, we must be permitted to say, that the definition is substantially that given in the General Statutes and the Constitution of the State, which are well known to the profession and easily understood ; and in the following of which one may fear no evil.

It is insisted that we should investigate the case with the view of correcting any error of fact occurring at the trial. We did ; besides investigating the facts of the case, off and on, for several weeks, more than a week was devoted exclusively to them. We did not, however, go into an analysis of the facts in our opinion, for the reason that such a course would have spread the opinion over much paper to no purpose. And in the investigation of the facts, we were unable to say that the lower court had interpreted them against their proper weight.

It is insisted, however, that the opinion of the contesting board, as to the weight of the evidence, should receive some consideration here. It is a sufficient answer to that proposition to say, that we are not reviewing an appeal from the decision of that board. We are reviewing an appeal from the decision of a circuit judge, who was the trier of the facts of the case *de novo*.

It is insisted that the question of citizenship, residence, etc., is one of mixed law and fact ; and, therefore, this court should review the whole case, uninfluenced

by the finding of the lower court as to the facts. We
think that the law fixes what residence, its place and
duration, entitles an individual to vote; but whether
such residence in fact exists is purely a question of
fact. If the question was submitted to a jury, the
court would instruct them, that, under the law, certain
facts must exist to constitute a legal residence; and
the jury would be the sole judges of the existence of
the facts. And this court would not be authorized to
set aside their finding, unless it was clearly against the
weight of the evidence. And the lower court having
clearly and correctly stated the law relative to resi-
dence, citizenship, etc., and having separated the facts
and passed upon them from the stand-point that a well-
instructed jury should, we feel bound, therefore, to test
the findings of the court by the same rule that we
apply in reviewing jury trials. Any other rule would
not only be generally unsatisfactory, but often result
disastrously. The witnesses, their relative standing,
their passions and prejudices, their intelligence, are
more or less known to the jury or presiding judge.
On the other hand, we know nothing of these things.
We might believe the evidence of Jack and Bill over
that of Tom, because they are two to one, and their
story is well told. Whereas, Jack and Bill might be
most incorrigible scapegraces, and Tom a most estima-
ble gentleman, and readily believed by all that knew
him. Furthermore, if we set the precedent of review-
ing the decisions of the lower courts upon mere ques-
tions of fact, and deciding without reference to their
opinions, or only giving them just a little weight, then
these courts had as well be abolished, if they could be,

and address all litigation directly to this court. The evils of such a policy on the part of this court would be felt by every citizen in the State.

The attorneys for the appellant are not unknown to this court; and their utterances of high respect for the judicial department of the State, and reverence for the laws, and their criticism of that class of persons in and out of the profession who contemn judicial decisions that fail to accord with their particular views, and which tend to degrade the wholesome administration of justice by weakening the confidence of the people, and thereby inciting them to lawlessness and evil deeds, is highly appreciated by the court. Therefore, we have deemed it proper, though compelled to overrule the petition, to write a response.